IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| CHRISTOPHER BATCH, | ) ) ) | Civil Action No. 2:11-cv-875 |
| Plaintiff, | ) ) ) | Judge Joy Flowers Conti |
| v. | ) ) | Magistrate Judge Cynthia Reed Eddy |
| CONSTABLE ROBERT GEAGAN; | ) ) | |
| BUTLER CITY POLICE DEPARTMENT; | ) | |
| and POLICE OFFICER RENSEL, | ) | |
| Defendants. | ) ) | |

## REPORT AND RECOMMENDATION

### I. RECOMMENDATION

Christopher Batch ("Batch" or "Plaintiff), in his Supplemented Second Amended Complaint (ECF Nos. 57, 78), brings claims against Butler City ("the City") and Butler City Police Officer Chad Rensel ("Rensel"),[1] several pursuant to 42 U.S.C. § 1983 one and pursuant to common law. The City and Rensel have filed Motions to Dismiss to be Treated as Motions for Summary Judgment (ECF Nos. 70, 95) to which Plaintiff has responded (ECF Nos. 88, 100). The Court recommends that the claims against the City be dismissed with prejudice. It further recommends that Rensel be granted qualified immunity with respect to the Fourth Amendment unreasonable search and seizure claims, and that all remaining claims against him be dismissed with prejudice.

---

[1] Claims lodged in the same Complaint against Butler City Constable Robert Geagan have been addressed in a separate Report and Recommendation. (ECF No. 113).

## II.    REPORT

**Facts**

Batch's case has been particularly difficult to analyze because from pleading to pleading his factual allegations and legal claims have changed radically. This has made responding to these claims extremely difficult for the Defendants, and problematic for the Court. On July 12, 2011, Batch, who is incarcerated at the State Correctional Institution at Somerset ("SCI-Somerset") on charges not relevant here, filed a pro se Complaint alleging violation of his rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments of the United States Constitution. The Complaint named as Defendants, Butler Constable Robert Geagan ("Geagan"), Rensel, and an unidentified journalist with the Butler Eagle. (ECF No. 3). In the original Complaint, Batch alleged that Geagan and Rensel engaged in an unlawful search and seizure. Before Defendants responded to this Complaint, Batch filed an Amended Complaint omitting the unidentified journalist,[2] but adding as Defendants the Butler City Police Department, and "Butler County-City of Butler District Court of Common Pleas." (ECF No. 7). Batch's amended Statement of Claim was brief, and in all salient respects, similar to the original:

> On or about October 27, 2009; at 325 W. Jefferson Street located in Butler County in the State of Pennsylvania; Defendant Constable Robert Geagan was in the above location apartment building, serving a warrant for a Christopher Diaz and Sabrina Guthrie. In the process of Plaintiff; Christopher Batch was leaving the premisis. The same [D]efendant Constable Robert Geagan asked Plaintiff if he had exited out of apartment two (2). Plaintiff stated that he had not exited out of apartment two (2) After these events defendant: Constable Robert Geagun; unhost and pulled his service weapon, and pointed it in the direction of the Plaintiff Christopher Batch to detain Plaintiff without just cause. Defendant Robert Geagan then proceeded to search the person of Plaintiff; Christopher Batch and then put contents back on the person of the

---

[2] In an Order dated 9/26/2011, Batch was directed to confirm whether he intended to press his case against the journalist. He failed to respond.

Plaintiff. Another officer, defendant Rensel, arrived on scene and the same search of the Plaintiff, Christopher Batch's person was searched again then proceeded to detain Plaintiff to be taken into custody for what was said to be identification purposes. While at the station defendant officer Rensel and unknown lieutenant executed a strip search on the person of the Plaintiff; Christopher Batch; which lead to the discovery of illegal drugs.

(Id. at pp. 3, 6-7) (spelling and grammatical errors in original). In response, Geagan filed a Motion to Dismiss (ECF No. 19) pursuant to Fed. R. Civ. 12(b)(6). The Court granted this Motion with prejudice as to the Fifth, Sixth, and Fourteenth Amendment claims, but held that Batch's Fourth Amendment claim survived (ECF No. 35).

Following the filing of a Motion to Dismiss for Failure to State a Claim (ECF No. 47) by Butler County, Batch filed three Motions to further Amend his Complaint yet again. In the first, Batch asked that Butler County be dismissed as a Defendant and that he be allowed to add the City of Butler, as it was "responsible for Officer Rensel and Officer Geagan['s] actions." (ECF No. 50). In the second Motion to Amend (ECF No. 51),[3] Batch also sought to add section 1983 claims against Rensel and Geagan for malicious prosecution and abuse of process, and against the City of Butler for failure to train, and for maintaining a "practice, policy and/or custom of shielding officers from complaints of citizens for mishandling evidence, failing to perform complete protocol and to supervise its officers in ethical procedures." (Id. ¶14).

In a Memorandum Order (ECF No. 53) dated September 6, 2012, the Court granted Butler County's Motion to Dismiss (ECF No. 47). Citing the policy of the Court of Appeals for the Third Circuit that "leave to amend the pleadings [is to be given] freely," the Court granted Plaintiff's request to make specified substantive amendments to the Second Amended Complaint. (ECF no. 53 at p. 2). The Court's Order set the following conditions:

---

[3] A duplicate Motion to Amend was docketed at (ECF No. 52).

> The second amendment to Plaintiff's Complaint . . . must
> be a stand-alone document independent of any Complaint
> or Motion already filed. The Second Amended Complaint
> must name all Defendants, include causes of action
> identifying Plaintiff's legal theories, and set out as many
> facts as possible surrounding the alleged wrongdoing . . .
> Plaintiff is strictly cautioned that the inclusion of claims
> distinct from those set forth in his prior Complaint or in the
> Motion[s] seeking to amend that Complaint will be
> considered a failure to comply with this Order and will
> result in dismissal of the Second Amended Complaint.

(Id. at p. 4) (internal citations omitted).

On October 11, 2012, Batch filed a Second Amended Complaint. (ECF No. 57). In his

statement of facts he asserted that his Fourteenth Amendment rights were violated when Geagan

and Rensel acted jointly in an "evil and reckless way" so as to engage in racial profiling. (Id. ¶5).

In support of this allegation, Batch stated:

> On October 27, 2009 Robert Geagan & Chad Rensel was
> dispatched to 325 West Jefferson St. In the City of Butler.
> Robert Geagan was given a warrant to arrest two caucasian
> people. When he arrived he seen a Black male in the hall,
> (Plaintiff). Then without questioning the black male,
> Robert Geagan pulled his service weapon on the black male
> then asked him if he came from a certain apartment. The
> black male gave Robert Geagan a apartment number, and
> which wasn't where Robert Geagan was order[ed] too for
> the arrest warrant. Gun still on the black male as he was
> seated. Another officer came about. Officer Rensel came to
> the scene with the knowledge of a arrest warrant for two
> Caucasian and never having contact with Geagan. As soon
> as Rensel entered the apartment building he started
> questioning the Black male.
>
> Robert Geagan and Chad Rensel acted in a racial profiling
> state as facts state in the omnibus records.[4] Both officers

---

[4]The omnibus records, to which the Court briefly referred in its Amended Report and Recommendation regarding the First Amended Complaint (ECF No. 35 at p. 2), were mentioned by Batch as evidence of racial profiling. These records were not attached to Batch's pleading, and were not available to the Court at the time the Amended Report and Recommendation was

> knew that the warrant[s] [were for two Caucasian] people,
> one male one female not a black male. Also page 4 of the
> omnibus records . . . shows Officer Rensel never
> questioned the white female.

(Id. ¶¶ 5-6) (footnote added) (grammatical and spelling errors in original). In the Second Amended Complaint, Batch does not allege that he was subjected to a search by Geagan; his sole claim against Geagan is based on allegedly unreasonable detention prior to Rensel's arrival at the scene.

Next, Batch states that Geagan and Rensel subjected him to malicious prosecution in that they "acted malicious and/or for the purpose of defaming, harassing, intimidating and/ or racial profiling Plaintiff." (Id. ¶7). According to Batch, he was arrested without probable cause, and was "deprived of his liberty as he was incarcerated and detained on said charges; he was required to attend all hearings and . . . to report to court personnel until the case was dismissed." (Id.).[5]

---

drafted. Later in the proceedings, Batch attached an exhibit to his Response to Geagan's Motion to Dismiss First Amended Complaint, (ECF No. 21-1). This was an Omnibus Pre-Trial Motion filed in in the Court of Common Pleas of Butler County, Pennsylvania, Case No. 2486 of 2009, in which his attorney filed an account of events transpiring on the night of Batch's arrest. He alleged that Rensel violated Batch's Fourth Amendment rights, and that evidence seized should be suppressed in the state criminal proceedings. In this document, Batch alleges that as Geagan approached, Batch was leaving the apartment where the persons named in the warrants to be served lived. Batch does not again mention Geagan, nor does he allege illegal action Geagan's part. The Motion also sets out Batch's account of Rensel's involvement in the events at issue. After Batch left the apartment where the arrest warrant was to be served, Rensel "arrived at the scene, immediately detained the Defendant, and demanded identification." (Id. ¶7). Batch identified himself as "Anthony Thomas." (Id. ¶9). Patrolman Rensel searched the Defendant and seized an Access Card identifying Batch. (Id. ¶8). The search of Batch's person "went beyond a mere frisk for weapons." (Id. ¶12). Batch "was taken into custody and transported to the Butler City Police Station for providing False I.D. to Law Enforcement. (Id. ¶14). While at the station, Batch was searched again, and various items including heroin, crack cocaine, cash, a two way radio, and cell phones were seized, allegedly in violation of the Fourth and Fourteenth Amendments to the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution.

[5] In his First Amended Complaint, Batch abandoned altogether allegations that Geagan searched him, and focused instead on an alleged seizure by Rensel.

Plaintiff next asserts claims against the City and its Police Department,[6] employees, and officers, alleging first that "[t]he City of Butler exhibited deliberate indifference in failing to properly train and supervise its officers in the collection, storage process of evidence due to the number of previously mishandled cases involving evidence . . . ." (Id. ¶100). Batch makes no effort to tie these allegations to events in which he was involved. He also makes unsupported allegations with respect to the City's deliberately indifferent failure to "properly train its officers in ethical procedures involving racial profiling, harassing, intimidating, racial discrimination [sic]." (Id. ¶12).

Batch also complains that his handcuffs were too tight when he was arrested, and that he suffered emotional distress, humiliation, fear, frustration, intimidation, helplessness and embarrassment. (Id. ¶¶18-20). Last, in the fact section of his Second Amended Complaint, Batch contends that he was the victim of abuse of process, and was falsely imprisoned on charges that were illegally obtained and ultimately dismissed. (Id. ¶23).

Batch then articulates the four counts upon which he now relies. In Count I, he states that he suffered malicious prosecution as a result of the actions of "Robert Geagan, Chad Rensel, . . . City of Butler, Butler Police Department, Mark A. Lope and District Attorney [sic] Office of Butler City in their individual capacities . . . ." (Id. at p. 5).[7] Count II is based on failure to train and supervise, and is leveled against the same Defendants. Count III asserts a Fourteenth

---

[6] For purposes of section 1983, a municipality and its police department are deemed to be a single entity. See Boneberger v. Plymouth Twp., 132 F.3d 20, 25, n.4 (3d Cir. 1997).

[7] Although Mark Lope And the District Attorney's Office of Butler County are named in the Second Amended Complaint, they are not named as Defendants, nor do the allegations in the Complaint describe their role in the alleged violation of Batch's constitutional rights. The docket fails to show that either has been served in this action. Because Lope and the District Attorney's Office are not parties to this action, the Court does not construe the Second Amended Complaint as stating a civil rights or other claim against them.

6

Amendment Equal Protection claim against all Defendants, and Count IV is a state law claim for malicious prosecution against the same parties. (Id. at p. 6).

Following the filing of Geagan's Motion to Dismiss the Second Amended Complaint, Batch filed a "Motion to Bring Forth Fourth Amendment Claim of Illegal Search and Seizure." (ECF No. 78). He alleged that he had failed to understand that he was permitted to include the surviving claim from his original Amended Complaint in his Second Amended Complaint. (Id. ¶4). He thus requested that he be permitted to assert, in what amounted to a Third Amended Complaint, "a Fourth Amendment claim against defendants Geagan & officer Rensel for illegal search and illegal detain." (Id. at p. 2). In an Order filed January 8, 2013, the Court, in deference to Batch's pro se status, generously granted Batch's Motion, ruling that Batch's Motion be considered a Supplement to the Second Amended Complaint. Defendants were given an opportunity to respond, and did so by filing a Supplemental Motion to Dismiss to be Construed as a Motion for Summary Judgment. (ECF No. 95). Batch replied. (ECF Nos. 88, 100).

## Standard of Review

Summary Judgment is appropriate only where there are no genuine issues of material fact. Matsushita Elec. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). While the moving party must demonstrate the absence of any genuine factual dispute, Celotex Corp. v. Catrett, 477 U.S. 317, 323(1986), the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Matsushita, 475 U.S. at 586-87 (1986) (emphasis in original removed).

7

In evaluating the evidence, the Court must view the facts and the inferences to be drawn therefrom in a light most favorable to the non-moving party. Anderson, 477 U.S. at 255. At the summary judgment stage, the Court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. See Anderson, 477 U.S. at 249. When examining the record to see if there are genuine issues of material fact, the Court's focus is on issue finding, not on issue resolution.

**Discussion**

The Court now turns to the adequacy of the Supplemented Second Amended Complaint as it applies to Rensel and the City of Butler, considering each count seriatim, the miscellaneous claims buried in the fact section of the Complaint, and the reanimated Fourth Amendment claims.

### Count I

Count I of the Second Amended Complaint alleges malicious prosecution. To survive a motion to dismiss a section 1983 malicious prosecution claim, a plaintiff must include in his complaint facts sufficient to support a plausible claim that: 1) the defendant initiated a criminal proceeding; 2) the proceeding ended in plaintiff's favor; 3) the proceeding was initiated without probable cause; 4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and 5) the plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding. See Estate of Smith v. Marasco, 318 F.3d 497, 521 (3d Cir. 2003). Even under the most liberal reading of his Second Amended Complaint, Batch has failed to make the required showing. The essence of his claim against Rensel is that he searched and arrested Batch without probable cause.

Even if the Court assumes, arguendo, that probable cause for the search or the arrest was lacking, Batch's allegations that Rensel acted maliciously or for a purpose other than bringing him to justice amount to nothing more than legal conclusions. The account of Batch's arrest and incarceration for purposes of establishing malicious prosecution could hardly be more spare. Batch writes:

> Robert Geagan and Rensel subjected Plaintiff to Malicious Prosecution in that:
>
> A) Robert Geagan and Officer Rensel acted malicious [sic] and/or for the purpose of defaming,[8] harassing, intimidating and/or racial profiling Plaintiff
>
> B) Plaintiff was deprived of his liberty as he was incarcerated and detained on said charges; he was required to attend all hearings and he was required to report to court personnel until the case was dismissed.

(ECF No. 57 ¶7) (footnote added). Despite Batch's having been given ample opportunity to supply adequate facts in support of his malicious prosecution claims and instruction in how to do so (ECF No. 53 at p. 3), the allegations in the Second Amended Complaint fall short of the standard announced in Bell Atl. Corp. v Twombly, 550 U.S. 544, 570 and Ashcroft v. Iqbal, 556 U.S. 662 (2009), even when Batch's pro se status is taken into account. Similarly, he has failed to adduce evidence required to overcome the Defendants' Motion for Summary Judgment. Accordingly, Rensel's Motion for Summary Judgment with respect to Count I of the Second Amended Complaint should be granted.[9]

---

[8] In order to state a constitutionally based defamation claim, a plaintiff must show that a state defendant defamed him, "and that the actor did so while depriving him of another constitutionally protected interest." Watson v. Borough of Darby, No. Civ. A. 9607182, 1997 WL 135701 at *4 (E.D. Pa. March 17, 1997). Nothing in the Second Amended Complaint satisfies this requirement. There are no facts whatever indicating that Rensel engaged in defamation. This claim should, therefore, be dismissed with prejudice.

[9] In his Second Amended Complaint, Batch also failed to follow the Court's directive that matters not surviving dismissal of the First Amended Complaint or not set out in his Motions to

9

Count II

Count II of the Second Amended Complaint, purports to state a "failure to train" and supervise claim against all Defendants including Rensel. Disposition of this Count insofar as it applies to Rensel, requires minimal discussion, as Batch does not allege that Rensel had a duty to train anyone in any aspect of the law or policy, that he was a policy or final decision maker for the City of Butler, or that he was associated - even tangentially - with the City's alleged failure "to properly train and to supervise its officers to prevent the practice of racial profiling or cultural bias." (Id. ¶17). Rensel's Motion for Summary Judgment as to Count II of the Second Amended Complaint should also be granted.

The same is true as to the failure to train claim against the City. Batch alleges that the City failed to train its police officers in the proper collection and storage of evidence – an unsubstantiated allegation which, even if true, has nothing to do with this case. (Id. ¶¶ 10) He also alleges failure to train in "ethical procedures involving racial profiling, harassing intimidating, racial discrimination." (Id. ¶¶ 11-13). In City of Canton v. Harris, 489 U.S. 378, 385 (1989), the Supreme Court held that the need for better training must be so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." Id. at 390. A municipality is liable under section 1983 only when its failure to act "reflects a 'deliberate' or 'conscious' choice." Id. at 389 (internal citation omitted). A showing of simple or even

---

Amend be omitted from a Second Amended Complaint. Batch raised a plethora of new claims. The Court would be justified in dismissing the Second Amended Complaint outright on this ground alone. Again, however, in deference to the fact that Batch is a pro se litigant, the Court agreed to consider the merits of the newly raised claims, finding that the Fourth Amendment claim set out in the original Complaint could be asserted as a Supplement to the Second Amended Complaint. See Order dated January 8, 2013.

heightened negligence is not enough. Berg v. Cnty. of Allegheny, 219 F.3d 261, 276 (3d Cir. 2000). Similarly, it is not enough to show that municipal officers could have been better trained or that additional training could have reduced the overall risk of constitutional injury. See Canty v. City of Philadelphia, 99 F. Supp. 2d 576, 581 (E.D. Pa. 2000) (citing Colburn v. Upper Darby Twp., 946 F. 2d 1017, 1029-30 (3d Cir. 1991)).

A plaintiff alleging failure to train must also "demonstrate a 'plausible nexus' or 'affirmative link' between the municipality's failure to train and the specific deprivation of constitutional rights at issue." Id. at 1213 (citation omitted). "'[T]he identified deficiency in the training program must be closely related to the ultimate constitutional injury,' and the plaintiff must 'prove that the deficiency in training actually caused the constitutional violation.'" Blakeslee v. Clinton Cnty., No. 08-1343, 2009 WL 2023554, at *2 (3d Cir. July 14, 2009) (internal citation omitted).

Batch has failed to establish any of the requisite elements of a failure to train claim against the City. Consequently, the City's Motion for Summary Judgment as to Count II of the Supplemented Amended Complaint should be granted.

## Count III

In Count III of the Second Amended Complaint, "Batch brings a [F]ourteenth [A]mendment Equal Protection (racial profiling) claim against [Rensel and the City of Butler]." (ECF No. 57 at p. 6). Batch has not, until now, articulated a Fourteenth Amendment claim based on racial profiling, and did not seek to do so in the requests to amend his Complaint.[10] To survive

---

[10] Although Batch used the term "racial profiling," in prior pleadings, he did so only in the context of a Fourth Amendment claim for malicious prosecution, a claim dismissed when the District Court adopted the Court's Amended Report and Recommendation. See Order dated April 12, 2012.

11

a motion to dismiss an equal protection claim in the context of racial profiling, Batch must have established that Rensel, in detaining him, was motivated by a discriminatory purpose and that the detention had a discriminatory effect. See Carrasca v. Pomeroy, 313 F.3d 828, 834 (3d Cir. 2002). In order to satisfy the first requirement, a plaintiff must show that he belongs to a protected class, and that he was treated differently from a similarly situated person outside the class. Bradley v. United States 299 F.3d 197, 206 (3d Cir. 2002). By his own admission, Batch was the only person in his situation when he was detained and arrested by Rensel. Therefore, there is no comparator. Furthermore, Batch was "strictly cautioned" that if he raised a claim for the first time in his Second Amended Complaint, it would be dismissed.

Count IV

Similarly, Count IV of Batch's Second Amended Complaint sets out, for the first time, a state law claim for malicious prosecution against Rensel and others, which should be dismissed for failure to comply with the terms of Court's Order permitting him to file a Second Amended Complaint. Furthermore, except for the need to show deprivation of a liberty interest, the elements of a malicious prosecution claim under Pennsylvania law are the same as those under section 1983. Kelly v. Gen. Teamsters, Chauffeurs, and Helpers, Local Union 249, 544 A.2d 940 (Pa. 1988). Batch's state law malicious prosecution claim is, like the federal claim, deficient. Rensel's Motion for Summary Judgment should be granted as to Count IV of the Amended Complaint.

12

Miscellaneous Claims Asserted in the Fact Section of the Second Amended Complaint[11]

Batch's false imprisonment claim is, in effect, part and parcel of his Fourth Amendment unreasonable seizure and false arrest claims. A section 1983 false imprisonment claim based on an arrest or detention made without probable cause "is grounded in the Fourth Amendment's guarantee against unreasonable seizures." Groman v. Twp. of Manalapan, 47 F.3d 628, 636 (3d Cir. 1995). False arrest is a "species" of false imprisonment and the two can be considered one tort. See Wallace, 549 U.S. at 388–89. See also, Garcia v. Cnty. of Bucks, 155 F. Supp.2d 259 (E.D. Pa. 2001) (stating that Fourth Amendment has been used to prohibit and or invalidate false arrests).

Batch did not assert abuse of process claims in his prior filings. Reference to this alleged wrong is, however, included in the fact section of the Second Amended Complaint, where Batch states that he "spent numerous days in Butler County Jail on charges that were illegally obtain [sic] by the officers of this case." (ECF No. 57 ¶¶ 22-23). Not only is this claim new, as Defendants point out, it is barred by the controlling statute of limitations.

In Wilson v. Garcia, 471 U.S. 261 (1985), the United States Supreme Court held that in actions brought pursuant to section 1983, courts should apply the state limitations period applicable to personal injury actions. The statute of limitations for abuse of process claims, as with other section 1983 claims sounding in tort, is two years. See Knoll v. Springfield Twp. Sch. Dist., 763 F.2d 584, 585, (3d Cir. 1985) (citing Pa. Cons. Stat. Ann. ¶5524). The statute of limitations on a section 1983 abuse of process claim begins to run "as soon as the right to institute and maintain a suit arises." Langman v. Keystone Nat'l Bank & Trust Co., 672 F.

---

[11] Even if a pro se plaintiff's claims are not set out in the clearest fashion, the Court is obligated to discern all the possible claims that the Plaintiff may be alleging. See Erickson v. Pardus, 551 U.S. 89, 94 (2007); Haines v. Kerner, 404 U.S. 519, 520–21(1972).

Supp.2d 691, 701 (E.D. Pa 2009) (quoting Sutton v. West Chester Area Sch. Dist., No. 03-cv-306, 2004 WL 999144 at *8 (E.D. Pa. May 5, 2004)). An abuse of process claim would, therefore, have arisen no later than the time of his arrest, which was in October 2009. Batch did not file his Second Amended Complaint until October 2012. His abuse of process claim is thus time barred. The same is true with respect to Batch's bare-bones statement purporting to support his newly raised claim for infliction of emotional distress.[12]

The Supplemental Fourth Amendment Claims and the Availability of Qualified Immunity

In the Court's Order dated January 8, 2013, Batch was granted what amounted to the opportunity to file a Third Amended Complaint – this time to include section 1983 claims alleging illegal search and seizure under the Fourth Amendment against Rensel. Consequently, the Court must determine whether the facts alleged by Batch in his Motion to Supplement the Second Amended Complaint are sufficient to support a plausible Fourth Amendment claim against Rensel. The Court finds that they are not, and even if they were, Rensel is entitled to qualified immunity.

Under the Fourth Amendment, evaluation of the legality of a seizure has two parts: determining whether there has, in fact, been a seizure, and, if so, whether the seizure was reasonable. United States v. Smith, 575 F.3d 308, 312 (3d Cir. 2009). "'[A] person is 'seized' . . . when, by means of physical force or a show of authority, his freedom of movement is restrained.' Put another way, no seizure has occurred if 'a reasonable person . . . would feel free to decline the officers' requests or otherwise terminate the encounter . . . .' " United States v. Wilson, 413 F.3d 382, 386 (3d Cir. 2005) (citing United States v. Mendenhall, 446 U.S. 544, 553 (1980)

_____

[12] In addition, in order to state a viable claim for infliction of emotional distress, a plaintiff must allege physical harm resulting from the defendant's outrageous conduct. See Swisher v. Pitz, 868 A.2d 1228 (Pa. Super. 2005). Batch has not done so.

14

(internal citations omitted)). See also Schneyder v. Smith, 653 F.3d 313, 319 (3d Cir. 2011) ("[A] Fourth Amendment seizure [occurs] . . . where there is a governmental termination of freedom of movement intentionally applied") (citation omitted). In his Supplemented Second Amended Complaint, Batch has adequately alleged a seizure effected by Rensel.

"For a seizure to be reasonable under the Fourth Amendment, "[t]he scope of the detention must be carefully tailored to its underlying justification." Bailey v. United States., __ U.S. __, __, 133 S. Ct. 1031, 1038 (2013) (quoting Florida v. Royer, 460 U.S. 491, 500 (1983)). This depends upon all of the circumstances surrounding the seizure. See New Jersey v. T.L.O., 469 U.S. 325, 337-342 (1985). "The permissibility of a particular law enforcement practice is judged by 'balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate government interests.'" Perez v. Borough of Berwick, No. 4:07-cv-2291, 2013 WL 1750997 at *5 (3d Cir. April 23, 2013) (quoting United States v. Villamonte-Marquez, 462 U.S. 579, 588 (1983)). "Methods employed by law enforcement that may seem extreme in hindsight are not per se constitutional violations, even if they caused discomfort to a plaintiff." Wargo v. Mun. of Monroeville, Pa, 646 F.Supp.2d 777, 784–5 (W.D.Pa. 2009) (citations omitted). This statement applies to the single sentence excessive force claim raised for the first time in the body of the Second Amended Complaint: "Chad Rensel harmed Plaintiff by physically putting handcuffs on plaintiff so tight that Plaintiff received a scar on his left wrist." (ECF No. 57 ¶18).

The Court finds that at the summary judgment stage of these proceedings, Batch's claim of excessive force under the Fourth Amendment is inadequate. There is no doubt that overly tight handcuffing may, in some cases, constitute excessive force. See Kopeck v. Tate, 361 F.3d 772, 777 (3d Cir. 2004). "Furthermore, the right to be free from the use of excessive force in the

15

course of handcuffing is clearly established and is not defeated by qualified immunity." Clifton v. Borough of Eddystone, 824 F. Supp. 2d 617, 631 (E.D. Pa. 2011) (citing Kopeck, 361 F.3d at 777). There is no record evidence that Rensel subjected Batch to excessive force. Batch does not allege that he complained to Rensel about the tightness of the cuffs, or that his demeanor should have made it clear to Rensel that he was in pain. The record also fails to establish that Batch sought or was given medical treatment for injury to his wrist. This case, as did Clifton, presents facts even less compelling that those in Gilles v. Davis, 427 F.3d 197 (3d Cir. 2005), where the United States Court of Appeals for the Third Circuit found that the circumstances surrounding the Plaintiff's handcuffing did not constitute excessive force. In Gilles, the plaintiff was arrested on charges of disorderly conduct and was handcuffed for up to four hours. He told officers that he was in pain, but did not display "obvious visible indicators of [that] pain." Id. at 208. He sought but was not given medical treatment. The Court of Appeals concluded that Gilles had not been subjected to excessive force. "Under these circumstances, Gilles is controlling and the Court must conclude that [Rensel] did not use excessive force when he handcuffed [Batch]." Clifton, 824 F. Supp. 2d at 631.

Next, the Court turns to the reasonableness of Batch's detention, search, and ultimate arrest. The right of a law enforcement officer to detain, search, or arrest may, in certain circumstances, be based on something less than probable cause; reasonable suspicion may be sufficient. The United States Supreme Court has distinguished between the legal standards of probable cause and reasonable suspicion. That Court's decision in Terry v. Ohio, 392 U.S. 1, 20 (1968) instructs that a police officer has the right to stop, search and detain an individual where the officer is able to adduce "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Id. at 21. "This must be more

16

than an inchoate and unparticularized suspicion or hunch. The Fourth Amendment requires some minimal level of objective justification for such intrusion. That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence and less demanding than the level for probable cause." 8A Fed. Proc., L. Ed. § 22:226 (2013). "An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime, but officers are not required to ignore relevant characteristics of the location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." Id. (citing Illinois v. Wardlow, 528 U.S. 119 (2000). "The purpose of permitting a temporary detention without probable cause or a warrant is to protect [law enforcement] officers and the public." United States v. Fautz, 812 F. Supp.2d 570, 663 (D. N.J. 2011) (quoting Smith, 3 F.3d at 1097).

"The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain and rapidly evolving . . . ." Graham v. Conner, 490 U.S. 386, 397 (1989). The Court must judge an officer's action "'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.' This reasonableness inquiry is an objective one." Curley v. Klem, 298 F.3d 271, 279 (3d Cir. 2002) (internal citations omitted).

The Court finds that Rensel's conduct in seeking to identify Batch was "objectively reasonable" given the situation confronting him, "regardless of [Rensel's] underlying intent or motivation." See Graham, 409 U.S. at 397 (citing Scott v. United States, 436 U.S. 128, 137–39 (1978)).[13]

---

[13] Batch, in his Supplemented Second Amendment Complaint, stresses that his ethnicity was the primary factor demonstrating that his seizure was unreasonable. The Court has already explained

In an Affidavit filed in support of his Motion for Summary Judgment (ECF No. 73-1), Rensel relates the following relevant facts concerning his October 2009 encounter with Batch. As an on-duty Butler City Police Officer with a decade of experience, Rensel was dispatched to assist Constable Geagan who was in the process of serving arrest warrants. (Id. ¶¶ 1-3). Rensel was "concerned that there could be a significant problem because the Constable was not in the habit of requesting police backup/assistance." (Id. ¶5). Rensel's concern was "further heightened because he [was] familiar with the building at 325 West Jefferson Street," a small building with a history of "all manner of problems requiring police response, ranging from the presence of unwanted guests, domestic disturbances, fights, burglaries and thefts [to] significant illegal drug activity." (Id. ¶7). The building was generally secured by exterior locks to which law enforcement personnel, due to the volume of calls to that building, were given keys by the landlord. (Id. ¶¶9,10). When Rensel entered the building, he found Geagan just inside "in the company of an unknown black male who was seated on the stairway near the constable." (Id. ¶12). Geagan told Rensel that he had gone to Apartment Two in order to serve an arrest warrant and encountered the black man leaving that apartment. (Id. ¶13).

Rensel "assumed control of the situation," asking the man if he resided in or was visiting someone in the building. Batch answered both questions in the negative. (Id. ¶¶13-15). At that point, Rensel became suspicious of Batch's activities, and "determined that it was necessary to learn the identity of the black male." (Id. at ¶¶16-17). The man told Rensel that his name was Anthony Thomas, and that his birthdate was August 11, 1989. Rensel ran this information through dispatch for verification, and to determine whether there were warrants outstanding.

that the facts articulated by Batch do not support his equal protection claim or an inference of racial profiling.

18

Dispatch could not locate a record of such person. (Id. ¶¶18-20). Rensel states that in his experience, when a record for a person who has given a name and a birthdate is not located, the individual supplying the information is usually being deceptive about his or her identity. (Id. ¶22). When "Thomas" was notified of the absence of records, he assured Rensel that he had been truthful. Rensel asked for identification, and "Thomas," denying that he had identification, began to empty his pockets. In the process, he took out a cell phone and "a Motorola Talk-About radio." (Id. ¶¶ 23-26).

Rensel stated that he knew, from years in law enforcement, that radios of the type produced were "used in these settings in the furtherance of criminal activity, specifically dealing in unlawful drugs." (Id. ¶27). The items removed from Batch's pockets, when added to the false identification, heightened Rensel's suspicions that Batch was involved in criminal activity. Rensel then advised "Thomas" that he was going to detain him to prove his identification and to do a weapons pat down. (Id. ¶ 29; ECF No. 88-1 at p.6.) During the course of the frisk, Rensel felt what he believed to be an identification card in the man's right rear pocket. He "suspected that it had not been produced because the man had outstanding arrest warrants." (Id. ¶31). When Rensel removed the card from the man's pocket, he found that it was a Pennsylvania Access Card issued to Christopher Batch. (Id. at ¶¶32-34).

After Batch told Rensel that he had stolen the card in Pittsburgh, Rensel detained Batch in a police car in order to investigate his true identity. (Id. at ¶37). When Batch's name was run through dispatch, Rensel discovered that an active arrest warrant had been issued for Batch by the Pittsburgh Police Department. (Id. ¶39). At that point, Batch was advised that he was under arrest, and was taken to the Butler Police Station for booking. During the booking, "a significant

19

quantity of illegal drugs was found hidden on his person," and Batch was charged with four drug-related crimes and giving false information to a police officer. (Id. ¶¶41-43).

In opposing Rensel's Motion for Summary Judgment, Batch filed as an exhibit the transcript of Rensel's testimony during suppression proceedings held in the Court of Common Pleas of Butler County, C.A. 2486 of 2009 (ECF No 88-1).[14] On direct examination, Rensel's testimony essentially tracked the information supplied in his Affidavit, as discussed in detail above.

Following Rensel's testimony that prior to the pat-down Rensel told Batch he needed to investigate Batch's identity, the prosecutor argued that the sole reason for the the pat down in order to check for weapons. Thus, he lacked justification to seize the identification card.[15] "If the

---

[14] The United States District Court for the Western District of Pennsylvania held in O'Hara v. Hanley, Civ. Act. No. 08-1393, 2011 WL 915776 at *3 (W.D. Pa. March 15, 2011) (citing Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782, 789 (3d Cir. 2000) that "this Court is not bound by a state court determination of probable cause."

[15] Though this Court is not bound by its holding, it finds the reasoning in United States v. Van Dam, No. 01-4146, 2002 WL 1277957 at *1 (10th Cir. June 11, 2001) persuasive in rejecting Batch's argument that Rensel exceeded the bounds of the Fourth Amendment in seizing the Access Card. Because its facts are essentially similar to those the Court now considers, the Court discusses that case in some detail.

In Van Dam, a law enforcement officer noticed a man and a woman in a car with out of state license plates parked near a pay phone at a service station. He later saw the same car parked near a phone at another station. The officer stopped to see if he could help. As he pulled up, the officer noticed that the license tag had expired. The man was in the passenger seat, and the woman was in the station. The officer asked the driver for his registration, and the driver responded that he did not have the registration, a driver's license, or identification. He gave his last name as "Jones," and said that the woman had been driving. The officer then entered the station to speak with the woman. She told him that the car belonged to a friend and that the man, who had been driving the car, was named Van Dam. Id.

A back up officer arrived at the scene, and determined that a "Terry frisk" should be conducted because of the conflicting information given about the man's identity, and the inconsistent statements about who had been driving the car. The backup officer frisked the man and found two wallets in his back pocket. Thinking that they might contain identification, he opened the wallets and saw what appeared to be methamphetamine. Id.

20

identification card had not been seized, Mr. Batch would not have been placed under arrest and charged with false identification to law enforcement." (Id. at p. 19). It followed that Batch would not have been taken to the police station and searched. On these grounds, Batch's

---

After being charged with a crime, the male Defendant contended that he should not have been searched and the wallet should not have been seized because "the officers did not have a reasonable articulable suspicion that he was armed and dangerous." Id. at *2. discovered and Commenting on this argument, the Court of Appeals stated:

> The Fourth Amendment protects individuals from unreasonable searches and seizures. See U.S. Const. amend. IV. Under Terry, this court determines the reasonableness of a search or seizure by conducting a dual inquiry, asking first "whether the officer's action was justified at its inception," and second, "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." United States v. Holt, 264 F.3d 1215, 1220 (10th Cir.2001) (en banc). We need not consider whether the search in question was valid under Terry, however, because we conclude the officers' search was lawful based on our determination that the officers had probable cause to arrest the defendant at the time of the search. See Rawlings v. Kentucky, 448 U.S. 98, 111, (1980) (holding that a search incident to a lawful arrest may precede the arrest, as long as the arrest follows quickly thereafter).

Id. The Court then stated:

> At the time of the search, the officers knew that defendant had identified himself with a different name than had been provided by the woman. The officers had probable cause to believe defendant had given a false name to mislead Harris as to his identity, in violation of Utah Code Ann. § 76-8-507 ("A person commits a class C misdemeanor if, with intent of misleading a peace officer as to his identity, birth date, or place of residence, he knowingly gives a false name . . . to a peace officer in the lawful discharge of his official duties.") The officers were authorized under Utah law to arrest defendant for that offense. The search that was subsequently conducted was designed to determine defendant's identification. We conclude the officers had probable cause to search defendant's wallet.

Id. at *3.

attorney asked that all of the contraband found on Batch's person during processing be suppressed. (Id.).

The District Attorney countered that Batch did not have the same expectation of privacy as he might in another location. He was in a secured private apartment building, and Rensel "was able to surmise that he did not belong there. So they certainly were entitled to ask him what he was doing there [and] to obtain information as to who he was and why he was there." (Id. at 20). "Once he feels that is an I.D. card . . . he doesn't have to ignore it. I'm not going to argue it was a weapon. But it's inconsistent with the information that was given . . . So he has a right to detain him . . . based on that. All the information then flowed from that I.D. card and the access card indicating there was an arrest warrant out for this young man." (Id. at pp. 20-21). The decision regarding suppression of the evidence found on Batch was taken under advisement." (Id. at p. 24).

Based on the foregoing discussion, the Court finds that Batch has failed to allege facts adequate to state a plausible claim that Rensel acted unreasonably in detaining, searching, or arresting Batch. When Rensel, an experienced police officer, was dispatched to aid Geagan, he believed that something out of the ordinary was underway, given that Rensel had never before received a call to back up the constable. He was also aware that the location to which he was being summoned was one of significant regular criminal activity – to the extent that the landlord had supplied law enforcement with keys to the secured entrance. When he arrived at the building, Rensel was informed by Geagan that Batch had exited the very apartment where Geagan was about to serve arrest warrants. Batch stated that he did not live in the building, and had not been visiting any of its residents. Furthermore, he supplied a false identification. As

discussion over Batch's identity evolved, Batch – without being instructed to do so – took certain things out of his pockets, including one unit of a two-way radio and a cell-phone.

When Batch emptied his pockets, the situation faced by Rensel changed. Rensel recognized that the items produced were regularly used in drug transactions. Given the location's reputation for illegal activity including drug trafficking, it became important for Rensel to protect himself, Geagan, and other residents of the building. Rensel, now operating with probable cause, announced to Batch that he intended to investigate his identity and frisk him for weapons. Batch's identity had become critical, and Rensel withdrew what felt like an identification card from Batch's pocket. Rensel immediately detained Batch in order to "run" the name on the Access Card, discovering that there was an outstanding warrant for Batch. It was then that Rensel took Batch to the police station for processing, and a large quantity of drugs was found on his person.

Batch's argument that Rensel, in the totality of the circumstances with which he was faced at that moment, had no right to remove the Access Card lacks merit. In his Opposition to Rensel's Motion for Summary Judgment (ECF No. 88), Batch attempts to cast doubt on the information in Rensel's Affidavit and his testimony at the suppression hearing, arguing that contradictions in both are sufficient to defeat Rensel's Motion for Summary Judgment. The Court is not persuaded.[16]

---

[16] Although Batch's arguments are not a model of clarity, and are repetitive in the extreme, the Court summarizes Batch's contentions as to why summary judgment should not be granted in Rensel's favor. Batch argues that Rensel should not have been permitted to question him regarding his identity, despite the fact that Batch was a non-resident in a secured apartment building with a reputation for significant criminal activity, because "[t]here is no statue in the state of Pennsylvania that allows a [sic] officer to detain and question a citizen" in that situation. (ECF No. 88 ¶¶2, 3). Because he was in the secured building, Batch argues that someone had to have granted him access, and Rensel had no right to question him. (Id. ¶4) Batch then revives his unsupported argument that he was questioned only due to his race, as evidenced by the fact that

23

Based on Rensel's familiarity with the reputation of the building in which Batch was found, and his knowledge that Batch had exited an apartment where Geagan was present to serve two arrest warrants, the Court finds that Rensel's request for identification was eminently reasonable. As the Supreme Court explained in a slightly different context,[17]"[a]sking questions is an essential part of police investigations. In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment. 'Interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth

---

Rensel failed to question a white woman who was also in the hallway. (Id. ¶¶5,8,10) Next, Batch alleges that Rensel made contrary statements, testifying that Batch exited Apartment Two, and, at the same time, claiming that Batch refused to reveal whom he had been visiting. (Id. ¶6) He states that it is significant that the Access Card contained only Batch's name and no other identifying information. (Id. ¶7). Batch finds a significant contradiction, too between Rensel's statements that he secured the Access Card during a frisk, but testified, too, that Batch voluntarily emptied his pockets. (Id. ¶11). In Rensel's Motion for Summary Judgment contains the statement that Batch admitted to the warrant in Pittsburgh, but there is no evidence to indicate that Batch "ever said them kind of words." (Id. ¶12). No one would have ever known that there was a pending arrest warrant for Batch if Rensel hadn't illegally seized the Access Card; therefore, Batch was deprived of his liberty. (Id. ¶13, 45). The statement that Batch is currently incarcerated on the charges underlying the Pittsburgh warrant are false. (Id. ¶14). Rensel referred to pulling out an identification card, when it was, in reality an Access Card. (Id. ¶18). Rensel made different statements as to whether Batch had been detained by Geagan when Rensel arrived at the scene. (Id. ¶21). Rensel testified that when he arrived at the apartment building, Batch was not engaged in suspicious activity, but later Rensel states that he became concerned. (Id. at ¶22). Batch could have been visiting any of the six apartments in the building. (Id. ¶23). Rensel did a frisk for weapons even though he stated that he knew that Batch didn't have contraband on his person. (Id. ¶26). (Parenthetically, the Court notes that this is not an accurate representation of Rensel's testimony. Rensel stated that he was frisking Batch for weapons even though Batch has not previously given him any indication that he was armed. The dimensions of what Rensel thought Batch may have been carrying changed when he voluntarily produced the dell phone and radio.) Batch next alleges that he was detained before Rensel knew that there was a warrant for Batch's arrest. (Id. at ¶28). This fact is uncontested.

[17] The decision in Hiibel v. Sixth Jud. Ct., 542 U.S. 177 (2004), addressed whether an arrest made pursuant to Nevada's "stop and identity" statute violated the Fourth Amendment. Although there is no similar statute at issue here, the Court's pronouncements on a law enforcement officer's right to ask for identification provide valuable guidance.

24

Amendment seizure.'" Hiibel v. Sixth Jud. Dist. Ct., 542 U.S. 177, 185 (2004) (quoting INS. v. Delgado, 466 U.S. 210, 216 (1984)). "[T]he ability to briefly stop a [suspect], ask questions, or check identification in the absence of probable cause promotes the strong government interest in solving crimes and bringing offenders to justice." Id. at 186 (quoting United States v. Hensley, 469 U.S. 221, 229 (1985)).

"Obtaining a suspect's name in the course of a Terry stop serves important government interests. Knowledge of identity may inform an officer that a suspect is wanted for another offense, or has a record of violence or mental disorder. On the other hand, knowing identity may help clear a suspect and allow the police to concentrate their efforts elsewhere." Id. Thus, even where there is mere suspicion of illegal activity, identity determination is reasonable, even though seizure of a valid identification card may not fall within a permissible Terry search. When, though, as here, a search of Batch's person was based on probable cause, there is no question that Batch's identity was critical, and seizing the card was reasonable in light of all known circumstances. See Morris v. Dixon, No. Civ. A.03 CV 6829, 2005 WL 950615 (E.D. Pa. April 20, 2005).

In Morris, police approached a car parked illegally in a fire lane in front of a building having "a documented problem with a high number of crimes, including drug trafficking, loitering, and assaults." Id. at 2. When the officer attempted to ascertain the identity of the man driving the car, confusion arose, as the suspect's wallet contained identification for two men, one of whom had an outstanding warrant for his arrest on burglary charges. The driver, who was arrested, later challenged his arrest under the Fourth Amendment. The District Court rejected that challenge on the ground that there was probable cause for the arrest. "[P]robable cause exists[ ] 'if at the moment the arrest was made . . . the facts and circumstances within defendants'

25

knowledge and of which they had reasonable trustworthy information were sufficient to warrant a prudent man in believing that plaintiff had violated the law.'" Id. at *6 (quoting Olender v. Twp. of Bensalem, 32 F. Supp. 2d 775, 788 (E.D. Pa. 1999), aff'd sub nom Olender v. Rubenstein, 202 F.3d 254 (3d Cir. 1999) (additional citations omitted)). The same standard applies to a search. "Consistent with [this] analysis . . . and with regard to [the defendant] providing false identification to [the officer], see 18 P.S. § 4914(a), . . . there can be no doubt that [the officer] had probable cause to arrest [the defendant]." Id. at *8. Here, Rensel informed Batch that he was under investigation for providing false identification, and conducted a search, recovering Batch's Access Card in the process. If, as the Court finds, Rensel had probable cause to arrest Batch, in these circumstances, he certainly had probable cause to search him in order to determine his identity.

In the interest of complete discussion, the Court notes that even if Rensel's seizure of Batch's Access Card amounted to a transgression of the Fourth Amendment, and that the right violated was clearly established at the time of the search, Rensel would, nonetheless, be entitled to qualified immunity. "Qualified immunity is not simply a defense to liability. Rather, it is intended to completely shield an officer from having to stand trial. Accordingly, the immunity issue should be considered at the earliest possible stage of the proceedings." Slusar v. Harff, No.2:11-cv-1311, 2013 WL 1703861 at *6 (W.D. Pa. April 19, 2013) (citing Giles v. Kearney, 572 F.3d 318, 325-26 (3d Cir. 2002)). Even in situations where there is a violation of a clearly established constitutional right of which a defendant should have been aware, qualified immunity may still be available. "A right is clearly established for purposes of qualified immunity when its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right." Hubbard v. Taylor, 538 F.3d 229, 236 (3d Cir. 2008) (citing Williams v.

26

Bitner, 455 F. 3d 186, 191 (3d Cir. 2006), in turn quoting Saucier v. Katz, 533 U.S. 194, 202 (2001) (internal quotations omitted). "[A] defendant is [, though,] protected from liability if he or she acts on the basis of a reasonable mistake of fact of law." Pearson v. Callahan, 552 U.S. 223, 231 (2009). As the Supreme Court in Pearson explained, "[q]ualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsible and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Id. This standard "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." Id. (citing Gilles v. Davis, 427 F.3d 197, 203 (3d Cir. 2005), in turn quoting Hunter v. Bryant, 502 U.S. 224, 229 (1991)).

Based on the Court's review of the case law, there is very little information to guide police officers facing the situation presented here. There is certainly ample room for mistake in what the law allows. Thus, even if the law could be construed so as to implicate Rensel in a Fourth Amendment violation, his conduct falls squarely within the parameters of qualified immunity. The Court is convinced that a reasonable officer on the scene, knowing what he knew at the time, could have believed that he was justified in removing the Access Card from Batch's pocket and, in fact, that failing to do so could result in the release of a person who had already committed a crime, and could have been implicated in or wanted for other criminal behavior. Because Rensel is entitled to qualified immunity, Summary Judgment on the Fourth Amendment claims should be granted in his favor.

## III. CONCLUSION

For the reasons set out above, it is respectfully recommended that the Motion to Dismiss to be treated as a Motion for Summary Judgment filed by Rensel and the City of Butler, and the

27

Supplemental Motion filed by the same Defendants (ECF Nos. 70, 95) be granted with prejudice in their entirety.

In accordance with the Magistrate's Act, 28 U.S.C. § 636 (b)(1)(B) and (C), and Rule 72.D.2 of the Local Rules for Magistrates, any objections to this Report and Recommendation must be filed within fourteen (14) days from the date of service of this document. Any response to objections must be filed within fourteen (14) days from the date of service of the objections. Failure to file timely objections will waive the right to appeal. Brightwell v. Lehman, 637 F.3d 187, 193 n.7 (3d Cir. 2011).

May 15, 2013

Respectfully submitted,

Cynthia Reed Eddy
United States Magistrate Judge

cc:     Counsel of Record

        Christopher Batch
        JY-7749
        S.C.I. Somerset
        1600 Walters Mill Road
        Somerset, PA 15510